UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

Nº 08-CV-4599 (JFB) (ARL)

———————————

MY FIRST SHADES AND VENETIAN HOLDINGS, LLC,

Plaintiffs,

VERSUS

BABY BLANKET SUNCARE AND MERCER GROUP, LTD.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
February 16, 2012

———————————

Joseph F. Bianco, District Judge:

Plaintiffs My First Shades ("MFS") and Venetian Holdings, LLC ("Venetian") brought this action against defendants Baby Blanket Suncare and the Mercer Group, Ltd. ("Mercer"), claiming that defendants have committed, and are continuing to commit, patent infringement in violation of the Patent Act, 35 U.S.C. § 271(a)-(c), as well as asserting additional claims pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), N.Y. Gen. Bus. L. § 360-1, and New York common law. Plaintiff MFS now moves to disqualify defendants' counsel – namely the law firm of Kudman Tachten Aloe ("KTA") because, according to MFS, KTA represented MFS or its predecessor for four years prior to the instant action and possesses confidential information relevant to the action.

I. BACKGROUND

A. The Amended Complaint

This case involves a patent for baby and toddler sunglasses. According to the amended complaint, Venetian is the owner of two United States patents, D485,291 and D485,293 ("the patents"). (Amended Complaint ("Compl.") ¶¶ 8-10.) MFS is the exclusive licensee of the patents. (*Id.* ¶ 12.) MFS is a producer and marketer of children's sunglasses and related products, and MFS plans to produce other products related to children's sunglasses to protect children from the sun. (*Id.* ¶¶ 12-13.) The plaintiffs allege that defendants, by selling and offering for sale products under the name Baby Blanket Sun Protectors, have infringed and continue to infringe the patents. (*Id.* ¶ 18.) The plaintiffs also allege

that the defendants wrongfully and fraudulently placed a false patent number on defendants' sunglasses. (*Id.* ¶ 22.)

B. Facts Regarding Disqualification Motion

1. MFS's Allegations Regarding KTA's Representation

MFS has submitted the affidavit of Kevin Tilton, a former director of "My First Shades/SLP" ("MFS/SLP") as well as an email from Thomas Furth, an attorney at KTA in order to set forth the relevant facts surrounding KTA's representation of MFS.

a. Tilton Affidavit

MFS/SLP was incorporated in 2002. (Tilton Aff. ¶ 12.) According to Tilton, KTA represented MFS/SLP from 2003 to 2006. (*Id.* ¶ 5.) Tilton states that Kudman Trachten[1] and its attorney Stuart Kudman had access to privileged information in the course of the representation of My First Shades/SLP. (*Id.* ¶ 4.) Specifically, Tilton states that Steven Paolino, a former director of MFS/SLP, retained KTA in 2003 to assist Steven Paolino in finding a purchaser, merger partner or distributor for his company, MFS/SLP. (*Id.* ¶ 6.) Tilton contends that Stuart Kudman and an associate met with Steven Paolino and Tilton on several occasions to discuss these matters. (*Id.* ¶ 7.)

During the course of the representation, KTA also undertook other legal tasks. According to Tilton, in 2003, KTA filed a trademark application on behalf of

---

[1] Kudman Trachten became Kudman Trachten Aloe at some point during or after the representation at issue in this case. (Kudman Aff. ¶ 3.) Given that the parties appear to agree that Kudman Trachten and Kudman Trachten Aloe are the same firm, the Court uses "KTA" to refer to the firm at all times.

MFS/SLP. (*Id.* ¶ 8.) KTA was also given information regarding a prior lawsuit between MFS/SLP and Baby Banz, a third party in the instant action. (*Id.* ¶ 9.) MFS/SLP informed KTA that the patents concerned the design of baby sunglasses and that they were owned by Lillian Paolino. (*Id.* ¶ 10.) KTA performed corporate, contract and intellectual property work for MFS/SLP. (*Id.* ¶ 12.)

In addition, Tilton states that Stuart Kudman arranged for a meeting with Turn Up the Music, Inc., a manufacturer and distributor of children's music CDs. (*Id.* ¶ 14.) The purpose of the meeting was to package theme-based compact discs with sunglasses in party-packs. (*Id.*) Stuart Kudman attended the meeting at the offices of Turn Up the Music, Inc., and toured the facility. (*Id.*) Tilton states that Stuart Kudman was involved in arranging introductions between MFS/SLP and two other companies: American Greetings and Carnival Cruise Lines. (*Id.* ¶ 16.) Tilton states that Stuart Kudman introduced MFS/SLP to "Steve Shapiro, whose in-laws own Emerging Vision/Sterling Optical or Cohen's Optical. Mr. Shapiro wanted to become part of the company. Mr. Shapiro represented his ties to the vision care industry as a way to grow the business." (*Id.* ¶ 17.)

Tilton states that Stuart Kudman was paid to help MFS/SLP "grow the business." (*Id.* ¶ 18.) When Stuart Kudman's efforts did not result in the growth of the business, Stuart Kudman "tried to make it up to [MFS/SLP] by drafting a distribution agreement for [MFS/SLP]." (*Id.*)

Tilton states that Stuart Kudman was given a client list, the patents, agreements MFS/SLP had at the time, and information

regarding MFS/SLP's manufacturing. (*Id.* ¶ 19.) Tilton states that KTA would have information relating to:

> past and present ownership positions; incorporation of My First Shades; designs of Plaintiff's sunglasses and profits derived from the inception of the business of Plaintiff; sales, and customers of Plaintiff; prior lawsuit with Baby Banz, the third party Defendant; any communications regarding licensing; Plaintiff[']s competitors and market sales; the Patents-in-Suit; samples of any product; demand for the products made by the patent-in-suit.

(*Id.* ¶ 20.)

### b. Furth Email

According to an email dated Wednesday, October 7, 2009 from KTA attorney Thomas Furth to plaintiffs' counsel, "Stephen Paolino retained Kudman Trachten LLP in 2003 and asked Stuart Kudman to assist him in finding a purchaser, merger partner, or distributor for his company, SLP Enterprises, LLC ("SLP").[2] (Pl.'s Ex. 2, Furth Email.) Furth states that "none of these efforts resulted in a transaction for SLP. Stuart [Kudman] and an associate discussed these matters with Stephen Paolino and Kevin Tilton and met with them on several occasions." (*Id.*)

Furth states that, apart from the filing of a trademark application in July 2003, KTA did not handle any of SLP's intellectual property matters. (*Id.*) The trademark application was abandoned one year later.

___

[2] Stuart Kudman states that he "was not involved in the formation or organization of SLP, which had occurred before [his] retention." (Kudman Aff. ¶ 15.)

(*Id.*) KTA was made aware of a "prior infringement claim against SLP asserted by Baby Banz, but that it had been resolved." (*Id.*) Furth states that KTA was advised of the patents' existence, and discussed that the patents concerned baby sunglasses and were held by Lillian Paolino. (*Id.*) Apart from these discussions, KTA did not discuss the patents at issue in this litigation. (*Id.*)

Furth states that, prior to the instant litigation, Furth was "unaware of the existence of the patents-in-suit, Lillian Paolino, Stephen Paolino, SLP or My First Shades." (*Id.*) Furth states that KTA "played no role in the ultimate sale of the business and was no longer representing Mr. Paolino when it took place." (*Id.*)

### 2. KTA's Allegations Regarding its Representation

KTA has submitted a declaration of Stuart Kudman outlining the extent of his representation of SLP Enterprises ("SLP"). According to Stuart Kudman, he "began representing SLP Enterprises LLC ("SLP") in connection with the efforts of a principal, Steven Paolino, to either sell the company or find a distributor for its products." (Kudman Aff. ¶ 2.) SLP used "My First Shades" as a "d/b/a." (*Id.*) Stuart Kudman states that his role was "primarily to identify potential strategic partners for SLP." (*Id.* ¶ 3.) "Secondarily, [his] role was to provide legal counsel about structuring deals with strategic partners." (*Id.*) Stuart Kudman states that "[n]one of the work [he] performed for SLP, nor that of anyone else at KTA (then known as Kudman Trachten LLP), concerned the formation of SLP, as the company was then already in existence." (*Id.*) KTA did not handle "litigation for SLP or perform any work related to the company's patents." (*Id.*)

Stuart Kudman states that he had discussions concerning the patents involved in the current action with Kevin Tilton, who was then Stephen Paolino's partner. (*Id.* ¶ 5.) Stuart Kudman asked Tilton "what the patents were about, and [Tilton] told [Stuart Kudman] that they concerned the design of the sunglasses and the headband. [Stuart Kudman] was also told that the patents were owned by Mr. Paolino's wife. [Kudman] had no other substantive discussions with anyone concerning the patents during [his] representation of SLP." (*Id.*) According to Stuart Kudman, Mr. Tilton informed him that SLP had been involved in litigation with Baby Banz, but that the case had been settled. (*Id.* ¶ 6.) Stuart Kudman also states that "[i]n 2003, SLP asked KTA to file a trademark application for the mark BANDITZ. I believe that the application lapsed in 2004. We did not handle any other intellectual property transactions for SLP." (*Id.* ¶ 12.)

Stuart Kudman also states that he "contacted several business people [he] knew, executives or principals of four companies, who [he] thought might have an interest in doing business with or perhaps even acquiring SLP." (*Id.* ¶ 7.) Stuart Kudman states that he participated in initial introductions with contacts from American Greetings and Carnival Cruise Lines. (*Id.*) Stuart Kudman also introduced SLP to Steven Shapiro and a principal of Turn Up the Music, Inc. to "discuss potential co-packaging distribution of the two companies' products." (*Id.*) According to Stuart Kudman, "none of the meetings concerned any confidential information regarding the scope, validity, enforceability or value of the patents-in-suit" (*id.* ¶ 8) and Stuart Kudman "never substantively discussed the patents at these meetings . . . [and] did not 'tout' the patents." (*Id.*)

According to Stuart Kudman, before learning of the instant litigation, he "was unaware of the existence of the Plaintiff, My First Shades, Inc." (*Id.* ¶ 13.) Stuart Kudman states that he "never had any dealings with the principals of MFS. [He was] informed and believe[s] that MFS was formed after [he] stopped representing SLP." (*Id.*) According to Stuart Kudman, "KTA had no involvement whatsoever in any dealings between SLP and MFS." (*Id.* ¶ 13.) Specifically, "KTA was not involved in any acquisition of assets from SLP to MFS." (*Id.* ¶ 13.)

Stuart Kudman states that sometime in 2006, he provided advice concerning the membership structure of SLP. (*Id.* ¶ 15.) He discussed "a potential transaction that would provide for the withdrawal or substantial reduction in the interest of one of its members . . . However KTA did not participate any further in the contemplated transaction." (*Id.* ¶ 15.)

Stuart Kudman responds to paragraph 20 of Tilton's affidavit, stating

I have no information concerning MFS, much less past or present ownership positions of the company. During the time I represented SLP, I knew who owned that company but after 2006, I had no such knowledge. I have no knowledge concerning the incorporation of SLP or MFS. I knew what SLP's sunglasses looked like, but that is public information. Any financial documents to which I might have had access concerning SLP will be discoverable and they will not, as far as I know, be a matter of controversy here. I knew of the existence of a lawsuit with Baby Banz, but as discussed above,

4

nothing further about it apart from the fact it had been settled. I was not privy to or aware of any communications concerning licensing of the patents by SLP. I was aware of SLP's competitors, but that information is readily available in the market. I was aware of the existence of the patents, but that is public knowledge. I saw samples of SLP's products as packaged and sold to the public. Finally, I don't understand what Mr. Tilton means by the term "demand for the products made by the patent-in-suit."

(*Id.* ¶ 16.)

### C.  Procedural History

MFS filed a complaint in this action on November 13, 2008. MFS and Venetian filed an amended complaint on June 15, 2011. MFS moved to disqualify KTA on August 22, 2011. Mercer filed an opposition to MFS's motion on September 22, 2011. MFS filed a reply to Mercer's opposition on October 6, 2011, and a motion to strike the Tilton affidavit and other exhibits on October 11, 2011. Oral argument was held on November 4, 2011. Mercer requested leave to file a sur-reply on November 23, 2011, which was granted on November 28, 2011. Mercer filed a sur-reply on January 5, 2012. MFS replied to Mercer's submission on January 30, 2012. The Court has fully considered the submissions of the parties.

## II. DISCUSSION

### A.  Standard for Disqualification of Counsel

Disqualification is viewed "with disfavor in this circuit," *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y.

1991) because it "impinges on parties' rights to employ the counsel of their choice." *Stratavest Ltd. v. Rogers*, 903 F. Supp. 663, 666 (S.D.N.Y. 1995). In particular, the Second Circuit has noted the "high standard of proof" required for disqualification motions because, among other things, they are "often interposed for tactical reasons, and that even when made in the best faith, such motions inevitably cause delay." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983) (internal quotation marks omitted); *accord Gov't India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

Nevertheless, the disqualification of counsel "is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). A federal court's power to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process,'" *Hempstead Video, Inc. v. Incorporated Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)), and "is only appropriate where allowing the representation to continue would pose 'a significant risk of trial taint.'" *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01 CV 1574 (ILG)(RML), 2006 WL 2013471, at *3 (E.D.N.Y. July 18, 2006) (citing *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)). In exercising this power, courts look for "general guidance" to the American Bar Association ("ABA") and state disciplinary rules, although the Second Circuit has emphasized that "not every violation of a disciplinary rule will necessarily lead to disqualification,"

*Hempstead Video, Inc.*, 409 F.3d at 132.[3] However, "any doubt is to be resolved in favor of disqualification."   *See Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *see also Nichols v. Vill. Voice*, 99 Misc. 2d 822, 826, 417 N.Y.S.2d 415 (N.Y. 1979).

### B.  Grounds for Disqualification

MFS argues that KTA should be disqualified because KTA represented MFS's predecessor in interest on matters bearing a substantial relationship to the present action and possesses confidential and privileged information relevant to the lawsuit.  Mercer argues that (1) any rights SLP may have had which arose out of its relationship with KTA did not flow to MFS, (2) there is no showing that KTA's representation of SLP is substantially related to the instant action, and (3) MFS has not shown that KTA possesses relevant privileged information.

As set forth below, the Court concludes that MFS has not met the "high standard of proof" for disqualification of KTA. *Evans*, 715 F.2d at 791.

### a.  Rules of Professional Conduct 1.6 and 1.9

The two key provisions of the New York Rules of Professional Conduct are Rule 1.6

---

[3] The Court also notes that Civil Rule 1.5(b)(5) of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York binds attorneys appearing before those courts to the New York State Lawyer's Code of Professional Conduct. Local Civ. R. 1.5(b)(5); *see, e.g.*, *United States v. Hammad*, 846 F.2d 854, 857-58 (2d Cir. 1988); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990) ("[I]n this Court federal law incorporates by reference the Code of Professional Responsibility.").

and 1.9.  Rule 1.6 provides, in relevant part, that "a lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person."

The Rules of Professional Conduct define "confidential information" as "information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential. 'Confidential information' does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates." Rule 1.6(a)(3).

The Rules of Professional Conduct analyze the duties owed by an attorney to a former client.  Specifically, Rule 1.9 provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Rule 1.9(a). Further, an individual lawyer's conflicts are ordinarily imputed to his firm based on the presumption that "associated attorneys share client confidences." *Hempstead Video, Inc.*, 409 F.3d at 133 (internal citations omitted); *see also* Rule of Prof. Conduct 1.10; *Kassis v. Teacher's Ins. & Annuity Ass'n*, 93 N.Y.2d 611, 616, 695 N.Y.S.2d 515, 717 N.E.2d 674 (N.Y. 1999) ("[W]here an attorney working in a law firm is

disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation."). The Second Circuit has held that an attorney may be disqualified if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video, Inc.* 409 F.3d at 133. As set forth below, under this standard, the Court finds in its discretion that disqualification is not warranted based on the evidence presented.

The first prong of this test requires an attorney-client relationship between the movant and the law firm sought to be disqualified. MFS has not produced sufficient evidence to demonstrate that there was an attorney-client relationship between MFS and KTA. MFS has produced evidence that establishes that SLP, doing business as "My First Shades," and KTA engaged in an attorney-client relationship, but plaintiff has not produced evidence that (1) plaintiff MFS, as the movant, engaged in an attorney-client relationship with KTA, or (2) that plaintiff MFS is a successor-in-interest to, or the same entity as, SLP.[4] It

---

[4] Tilton's affidavit refers to SLP as "My First Shades." It is evident from the totality of the evidence presented that the company Tilton refers to is SLP, doing business as "My First Shades."

may be the case that MFS is related to SLP in a manner sufficient to assert an attorney-client relationship based on SLP's dealings with KTA.[5] At this juncture, however, the plaintiffs have not provided any evidence to demonstrate that MFS is a successor-in-interest to SLP.[6] The plaintiffs bear the burden in demonstrating that an attorney-client relationship existed between plaintiff MFS and KTA, and the Court concludes that this burden has not been met.[7]

The next prong of the test requires that there be a "substantial relationship" between

---

[5] The Court notes that defendants have submitted a purchase agreement between SLP and "David Scheinberg/Newco Inc." with their sealed motion to dismiss. (Defs.' Mot. Dismiss Ex. F, Nov. 13, 2009, ECF No. 36.) At present, the relationship between SLP and MFS is unclear, and the nature of the relationship will affect whether MFS is categorized as a prior client of KTA. *See SMI Indus. Canada Ltd v. Caelter Indus.*, 586 F. Supp. 808, 815 (N.D.N.Y. 1984) ("Indeed, plaintiff has failed to cite a single case in support of the proposition that an assignee of assets stands in the shoes of its assignor for purposes of Canon 4. The court has, however, located several cases that hold an assignment of intellectual property does not assign the assignor's attorney to the assignee."); *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 90 (5th Cir. 1976) ("Assignment of the patent does not assign [attorney] along with it."). The Court need not address this issue as MFS, the party carrying the burden in the instant motion, has not submitted sufficient evidence for the Court to determine the relationship between SLP and MFS.

[6] At oral argument, plaintiff's counsel acknowledged that the incorporation of MFS occurred in 2007 or 2008. This is the only evidence MFS has presented regarding the incorporation of MFS.

[7] The Court is aware that in their interrogatories, defendants defined "Plaintiff" to include "divisions, subsidiaries, consultants, agents, attorneys and representatives, affiliates, predecessors or successors-in-interest, such predecessors and affiliates to include, without limitation, SLP Enterprises, LLC . . ." (Pl.'s Ex. 3, Defs.' Interrogatories, Oct. 6, 2011, ECF No. 58.) The Court does not determine this to be an admission or agreement that SLP is a predecessor-in-interest to MFS.

the issue in the pending case and those in the prior representation. At this stage in the litigation, it is unclear whether the prior representation bears a substantial relationship between the issues here: patent infringement, Lanham Act claims, and state law fraud and injury to business reputation claims. With respect to Stuart Kudman's knowledge of the patents, it is unclear at this time how this is substantially related to the claims of patent infringement against the defendants. In addition, the Court notes that defendants have requested to brief the issue of whether MFS even has standing to assert patent claims against defendants. (Defs.' Letter, Aug. 8, 2011, ECF No. 53.) With respect to potential damages, KTA's representation of SLP on corporate matters may be related to the damages at issue in this case.[8] Assuming *arguendo* that the second element is satisfied, this prong cannot warrant disqualification alone; the first and third prongs must also be satisfied.

The final requirement under the test articulated in *Hempstead Video* is that "the attorney whose disqualification is sought had access to, or was likely to have access to, relevant privileged information in the course of his prior representation of the client." *Hempstead Video, Inc.*, 409 F.3d at 133. MFS has failed to demonstrate the specific, privileged information that was allegedly divulged to Stuart Kudman and KTA. Tilton's statement that KTA "was given information regarding a prior lawsuit between SLP and Baby Banz" does not indicate that privileged information was exchanged. In addition, with respect to attempts to find a strategic partner, it is

unclear whether this involved the exchange of confidential information. Information regarding profits, pricing, and other financial information is not privileged information without more specific allegations regarding communications between SLP and KTA.

Thus, the Court concludes that MFS has not satisfied the requirements of the test set forth in *Hempstead Video*. MFS may, however, renew the motion if and when it possesses sufficient information to demonstrate that: (1) MFS is a successor-in-interest or otherwise entitled to assert the attorney-client privilege based upon KTA's representation of SLP; (2) there is a substantial relationship between KTA's representation of SLP and the instant action; and (3) KTA had access to relevant privileged information.

## IV. CONCLUSION

For the foregoing reasons, the Court denies MFS's motion without prejudice.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:  February 16, 2012
    Central Islip, NY

\* \* \*

Plaintiff is represented by Philip M. Weiss, Esq., of Weiss & Weiss, 300 Old Country Road, Suite 251, Mineola, New York 11501. Defendant is represented by

---

[8] The Court notes, however, that plaintiff has failed to specify (1) the time period for which damages are sought, and (2) the connection between KTA's knowledge of certain corporate matters and damages theories for the claims asserted.

Thomas F. Furth, Esq., and Michelle S. Babbitt, Esq., of Kudman, Trachten, Aloe LLP, 350 Fifth Avenue, Suite 4400, New York, New York 10118.