UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

MY FIRST SHADES and VENETIAN HOLDINGS,
LLC,

                         Plaintiffs,

            v.

BABY BLANKET SUNCARE and THE MERCER
GROUP, LTD,

                         Defendants.

----------------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
08-CV-4599 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs My First Shades ("MFS") and Venetian Holdings, LLC ("Venetian") bring the

above-captioned action against Defendants Baby Blanket Suncare and The Mercer Group, LTD

("Mercer") claiming patent infringement, fraud, unfair competition and dilution and injury to

business reputation.[1]  Mercer moved for summary judgment against MFS as to the patent

infringement claim on the grounds that MFS has no standing and moved to dismiss Plaintiffs'

fraud claim on the ground that it is not properly pled.  The Court heard argument on December

12, 2012, as well as sworn testimony from Kevin Tilton.  For the reasons set forth below,

Mercer's motion for summary judgment and its motion to dismiss are denied.

    **I.**    **Background**

      MFS is a producer and maker of children's sunglasses.  (Compl. ¶ 12.)  At the

commencement of the litigation, Venetian was the holder of United States patents, Nos.

---

[1] Mercer alleges that Plaintiffs sued the incorrect party when they sued Baby Blanket
Suncare and that Mercer is the correct entity.  (Def. 56.1 ¶ 3.)  The motions were made on behalf
of Mercer.

D485,291 and D485,293 (the "Patents").  (Def. 56.1 ¶ 4; Pls. 56.1 ¶ 4.)  The Patents were

assigned to Venetian by inventor, Lillian Paolino, on March 1, 2007.  (Def. 56.1 ¶ 6; Pls. 56.1 ¶

6.)  SLP Enterprises LLC ("SLP") was a limited liability corporation whose principals were

Lillian Paolino, Steven Paolino (husband of Lillian Paolino), and Kevin Tilton.  (Testimony of

Kevin Tilton ("Tilton Test.") 19:4–24:8, 30:23–43:7, 45:25–49:1.)  Prior to the assignment of the

Patents to Venetian, SLP had the exclusive license to the Patents.  (*Id.*)

On March 1, 2007, the board of SLP, by board resolution ("Board Resolution"), agreed to

sell all of its interests and property to David Sheinberg.  (*Id.*; Furth Decl. Ex. G (Minutes of

Manager and Members Meeting Amending the Operating Agreement of SLP for the Sale of the

Company).)  The Board Resolution states in pertinent part:  "**RESOLVED**, that the Sale of

[SLP] and it's [sic] Assets to David Scheinberg is hereby approved[.]"  The Board Resolution

was signed by Lillian Paollino, Kevin Tilton, and Stephen Paolino.[2]

SLP's sale to David Scheinberg/Newco Inc. ("Sheinberg") occurred pursuant to a

Purchase and Sale Agreement ("Agreement").  (Furth Decl. Ex. E. (Purchase and Sale

Agreement).)  The parties to the Agreement were Stephen Paolino, Kevin Tilton and SLP on

behalf of the "Seller" and Scheinberg on behalf of the "Purchaser."  (Def. 56.1 ¶ 10.)  The

Agreement provided for partial payment at the time of the sale and a promissory note ("Note") to

be paid over a period of time.[3]  The Agreement also provided that the Note would contain a

provision giving the sellers the right to retain the use of Patents and to void all rights of the

_____

[2] All three signatures were identified as the signatures of these individuals by Tilton.
(Tilton Test. 25:14–19.)

[3] Upon the sale of SLP to Sheinberg, the sellers transferred their ownership interest in the
Patents to Venetian as a holding company, in order to retain an interest in the Patents until the
Note was paid in full.  (Tilton Test. 32: 9–34:8.)

purchasers in the Patents if they failed to make the necessary payments pursuant to the Note for a
90-day period.

Specifically, Paragraph 3(B) of the Agreement provided in pertinent part:

> IT IS SPECIFICALLY AGREED THAT SAID NOTE SHALL CONTAIN A
> PROVISION THAT IN THE EVENT NO PAYMENT IS MADE ON THE NOTE
> FOR NINTY [sic] (90) DAYS, THE SELLER HEREIN SHALL HAVE THE
> ABSOLUTE AND IMMEDIATE RIGHT TO REGAIN THE USE OF ALL
> INTELLECTUAL PROPERTY INVOLVED IN THIS SALE, ALL RIGHTS
> INVOLVING THE TRANSFER OF OWNERSHIP OF SAID INTELLECTUAL
> PROPERTY TO THE PURCHASERS WILL BE DEEMED NULL AND VOID, AND
> THE SELLERS SHALL RETAIN ALL OWNERSHIP AND USE RIGHTS TO SAID
> INTELLECTUAL PROPERTY.

(Def. 56.1 ¶ 20; Furth Decl. Ex. E) (emphasis in original). The Note provided for 60 monthly
payments commencing on July 1, 2007 and ending on June 1, 2012. (Def. 56.1 ¶ 18; Pls. 56.1
¶ 18.) All payments had not been made on the Note at the filing of the action, but the Note has
since been fully paid. (Def. 56.1 ¶ 18; Pls. 56.1 ¶¶ 18–19; Scheinberg Decl. ¶¶ 2–3.)

In addition to providing for the reversion of all rights to the sellers if the purchasers failed
to pay pursuant to the Note, the Agreement created certain restrictions on the Patents until the
Note was fully paid. Paragraph 2(D) of the Agreement states in pertinent part:

> Not withstanding [sic] anything else in this Agreement, all Intellectual Property being
> sold herein, as specifically noted on Exhibit "A", will continue to be owned by the Sellers
> IN THEIR INDIVIDUAL CAPACITY OR THROUGH A THIRD PARTY until the
> Note is fully paid and/or satisfied. Until that time the Purchaser shall have a full and
> complete License to use said Property as it were their own except that they cannot sell,
> transfer, SUB LICENSE or encumber it in ANY way. All fees involving said Property
> will be paid by Seller and, upon presentment of proof of payment to Purchaser, be
> reimbursed by Purchaser to Seller within 10 days.
>
> Purchasers agree, prior to their paying off the Note and gaining full ownership of the
> intellectual property, that they will not file for any additional Patent or Trademark that
> is based on any of the intellectual property that forms the basis of this Agreement
> without the written consent of the Sellers. . . . It is further agreed that Purchaser, prior to
> paying off the Note and obtaining full ownership of the intellectual property, shall take

no actions or be involved in any litigation involving the validity of said Patent, Trademark or License without the written approval of the Sellers.

(Def 56.1 ¶ 17; Pls. 56.1 ¶ 17; Furth Decl. Ex. E) (emphasis in original).

In a letter dated March 3, 2008 from Stuart S. Perry, Esq. to Robert Sylvor, Esq., MFS[4] received permission to commence litigation if it hired a particular attorney and agreed to pay the costs and expenses associated with the litigation.  (Pls. 56.1. ¶ 17; *see also* Titon Test. 43:21–45:24, 49:13–55:16.))  The letter provides in pertinent part, "[m]y clients will happily Consent to your taking whatever steps necessary to protect the Patents and Trademarks under [certain conditions]."  (Pls. 56.1. ¶ 17; Furth Decl. Ex. F. (Perry Mar. 03, 2008 Letter).)  The first provision required no action on the part of MFS; under it, Venetian agreed to open a new corporation to handle the assets of Venetian.  (Furth Decl. Ex. F.)  The last two provisions required MFS to (1) have attorney Phillip Weiss handle the litigation and (2) pay all costs and expenses for the litigation.  (Furth Decl. Ex. F.)

## II.   Procedural History

MFS commenced this action as the sole plaintiff on November 13, 2008.  MFS sued Mercer and Baby Blanket Suncare.  (Def. 56.1 ¶¶ 1, 3; Pls. 56.1 ¶¶ 1, 3.)  In its Answer and Counterclaims, Mercer asserted that MFS did not have standing to bring the action.  (Def. 56.1 ¶ 7.)

On November 13, 2009, Mercer moved to dismiss the Complaint, arguing that MFS did not have standing.  (Docket Entries Nos. 34–39.)  On June 2, 2011, at oral argument on Mercer's

---

[4] Scheinberg is the President and owner of MFS.  (Scheinberg Decl. ¶ 1.)  SLP previously owned the MFS brand and sold it along with the Patents to Scheinberg in 2007.  (Tilton Test. 23:20–24:8; Furth Decl. Ex. E.)  MFS and Scheinberg are used interchangeably throughout this decision.

motion to dismiss, Judge Bianco[5] granted MFS leave to amend the Complaint to add Venetian as a plaintiff.  (Def. 56.1 ¶ 1; Pls. 56.1 ¶ 1.)  Judge Bianco told Mercer at oral argument that if after amendment, it still believed MFS lacked standing, Mercer could renew its motion to dismiss on standing grounds.  (*See* Def. 56.1 ¶ 1; Def. Mem.)  On June 15, 2011, MFS amended the complaint to include Venetian as a plaintiff.  (Docket Entry No. 41.)

Mercer subsequently moved for summary judgment as to MFS on the patent infringement claim.  Mercer argues that even when joined by Venetian, MFS lacks standing to assert a claim for patent infringement.  (Def. 56.1 ¶ 2; Docket Entry No. 41.)  Mercer also moved to dismiss Plaintiffs' fraud claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it has not been properly pled.  At oral argument on December 12, 2012, the Court heard sworn testimony from Kevin Tilton.

## III.    Discussion

### a.   Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012); *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a

---

[5] This case was reassigned to the undersigned on March 29, 2012.

scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on

which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide

"whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving

party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394,

398 (2d Cir. 2000).

In reviewing a motion to dismiss under Rule 12(b)(6) of Federal Rule of Civil Procedure,

the court must "accept as true all allegations in the complaint and draw all reasonable inferences

in favor of the non-moving party." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d

57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir.

2009)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged — but  it has not 'show[n]' — 'that the pleader is entitled

to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In deciding whether to

dismiss a complaint under Rule 12(b)(6), a district court "is generally limited to the facts as

presented within the four corners of the complaint, to documents attached to the complaint, or to

documents incorporated within the complaint by reference." *Taylor v. Vt. Bd. of Educ.*, 313 F.3d

768, 776 (2d Cir. 2002).

### b.  Standing in a Patent Infringement Case

### i.  Legal Standard

"A party's standing to sue for patent infringement derives from the Patent Act, which provides that '[a] *patentee* shall have remedy by civil action for infringement of his patent.'" *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010) (emphasis in original) (quoting 35 U.S.C. § 281).   "A 'patentee' includes 'not only the patentee to whom the patent was issued but also the successors in title [assignees] to the patentee." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1346 (Fed. Cir. 2001) (alteration in original) (quoting 35 U.S.C. § 100(d)).   Courts have interpreted the Patent Act to confer standing to not only patent owners but any party with some substantial rights to the patent (including parties with less than all substantial rights), as long as the title holder of the patent is joined.  *Id.* at 1348 ("As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the *Lujan* requirements.");[6] *see also WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) ("[A] party has the right to sue for infringement of the patent 'if that party has a legally protected interest in the patent created by the Patent Act, so that it can be said to suffer legal injury from [the] act of infringement.'" (alteration in original) (citations omitted)).

---

[6] In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court set out the requirements for constitutional standing.  The three requirements are: (1) the party must have suffered an injury in fact; (2) there must be "a causal connection between the injury and the conduct complained of[;]" and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560 (citations omitted).

Patent owners, including assignees and exclusive licensees who were given all substantial rights to the patent, may sue alone in their own right.[7]  *See Intellectual Prop.*, 248 F.3d at 1345 ("A grant of all substantial rights in a patent amounts to an assignment — that is, a transfer of title in the patent — which confers constitutional standing on the assignee to sue another for patent infringement in its own name."); *Speedplay Inc., v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) ("A party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights."); *Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 289–90 (S.D.N.Y. 2010) ("[C]ourts permit exclusive licensees to bring suit in their own name, without joining the patent owner, if the exclusive licensee holds 'all substantial rights' in the patent, becoming, in effect, an assignee (and therefore a 'patentee' within the meaning of Section 281).").

Exclusive licensees, with less than all substantial rights to the patent, may sue only if the owner of the patent is joined as a necessary party in the litigation.  *See Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) ("[W]here an exclusive license transfers less than 'all substantial rights' in the patents to the exclusive licensee, the exclusive licensee may still be permitted to bring suit against infringers, but the

---

[7] When determining whether or not all substantial rights were transferred, courts consider "the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent."  *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360–61 (Fed. Cir. 2010).  However, generally the most important consideration is "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor[.]"  *Id.*  Parties with no restrictions and all substantial rights to the patent may sue on their own, without having to add additional parties.  *Id.* at 1359.

patent owner is an indispensable party who must be joined."); *Intellectual Prop.*, 248 F.3d at

1347–48 ("[A]n exclusive licensee having fewer than all substantial patent rights . . . that seeks

to enforce its rights in a patent generally must sue jointly with the patent owner."); *Telebrands*,

719 F. Supp. 2d at 289–90 ("An exclusive licensee ordinarily may not sue in its own name alone,

but must join the patent owner in an action brought against an accused infringer.").

 An exclusive licensee has standing because "[a] party . . . that has the right to exclude

others from making, using, and selling an invention described in the claims of a patent is

constitutionally injured by another entity that makes, uses, or sells the invention" and therefore

has constitutional standing. *Intellectual Prop.*, 248 F.3d at 1346–47; *see also Morrow v.*

*Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) ("[An exclusive licensee] is injured by

any party that makes, uses, sells, offers to sell, or imports the patented invention.").  However, as

a prudential standing matter, an exclusive licensee is required to join the title holder to prevent

multiple litigations regarding the same patent.[8]  *See IpVenture, Inc. v. Prostar Computer, Inc.*,

503 F.3d 1324, 1325 (Fed. Cir. 2007) (stating that the purpose of joinder when the licensee has

some but not all substantial rights is to prevent "an accused infringer [from being] subjected to

multiple suits and duplicate liability."); *Morrow*, 499 F.3d at 1340 ("[T]he patentee who

transferred these exclusionary interests is usually joined to satisfy prudential standing concerns.

The patentee is joined for the purpose of avoiding the potential for multiple litigations and

multiple liabilities and recoveries against the same alleged infringer.").  It is sufficient for

standing purposes that the title holder is eventually added to the suit, even if the title holder was

not in the suit originally, because the exclusive licensee meets constitutional standing

---

[8] "[A]nother policy consideration is to prevent a party with lesser rights from bringing a lawsuit that may put the licensed patent at risk of being held invalid or unenforceable in an action that did not involve the patentee." *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1343 (Fed. Cir. 2006).

requirements.  *Intellectual Prop.*, 248 F.3d at 1349; *see also Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1310 (Fed. Cir. 2003) ("[A]n exclusive licensee with less than all substantial rights in the patent did not have the right to sue under the Patent Act at the inception of the lawsuit, but could cure the defect by filing a motion to join the patentee as a plaintiff." (citing *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1019 (Fed. Cir. 2001)).

Another category of licensee is a holder of a bare license.  Such a license holder has no right to sue for patent infringement.  *See Intellectual Prop.*, 248 F.3d at 1345 ("[A] nonexclusive license or 'bare' license . . . confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or 'bare') licensee suffers no legal injury from infringement."); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1553–54 (Fed. Cir. 1995) ("The grant of a bare license to sell an invention in a specified territory, even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others.").  Bare license holders do not have constitutional standing because they do not have the right to exclude others from using the patent; and, therefore, they cannot be injured by another's use of the patent.  *Morrow*, 499 F.3d at 1340–41 (describing why bare license holders lack constitutional standing); *see also WiAV Solutions*, 631 F.3d at 1265 ("[A] so-called 'bare licensee' holds nothing more than a promise from the patentee that the patentee will not sue the licensee for practicing the patented invention.").  Holders of bare licenses "do not . . . 'share' with the patentee the property rights represented by the patent so as to have standing to sue as a co-plaintiff with the patentee."  *Rite-Hite*, 56 F.3d at 1553.  Therefore, "[t]his standing deficiency cannot be cured by adding the patent title owner to the suit."  *Morrow*, 499 F.3d at 1341.

### ii.   Exclusive License Versus Bare License

The issue before this Court is whether MFS was given an exclusive license with less than all substantial rights and therefore has standing to sue Mercer, or a bare license and thus no standing to sue.[9]   Under an exclusive license, a licensee may exclude others from using the license.  *Morrow*, 499 F.3d at 1340 ("Parties that hold the exclusionary rights are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention.").  In contrast, a bare license is "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities" but the licensee has no right to exclude others.  *Intellectual Prop.*, 248 F.3d at 1345; *see also Morrow*, 499 F.3d at 1340–41 (Bare license holders "are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights.").  The title of the transfer in the agreement does not determine what type of agreement it is, rather a court looks to the kinds of rights that are transferred to determine the licensor and licensee's status.  *Intellectual Prop.*, 248 F.3d at 1344 ("The title of the agreement at issue, which uses the term 'license' rather than the term 'assignment,' is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination.").  Therefore, the Court must

---

[9] Both sides agreed at oral argument that MFS was not given an exclusive license with *all* substantial interest allowing it to bring suite on its own.  (Oral Arg. Tr. 5:5–6:3.)  Indeed, by granting MFS leave to add Venetian, Judge Bianco found that MFS had not been transferred all substantial rights.  Moreover, while Mercer initially challenged whether MFS was given *any* license since there were no documents transferring any such license from the inventor Lillian Paolino or Venetian to SLP or MFS, after Tilton testified at oral argument that SLP was the exclusive licensee of the Patents which license was transferred to MFS pursuant to the sale of SLP, Mercer abandoned the argument that MFS had no license.  (Oral Arg. Tr. 58:4–59:15.)  Mercer instead argued that under the case law, the restrictions placed on the transfer of the Patents makes the license a bare license rather than an exclusive license.  (*Id.*)

11

determine what rights were granted to MFS and whether it was an exclusive license or a bare license.

Mercer points to several restrictions on MFS's rights in the Agreement and argues that because of these restrictions, MFS was granted a bare license and not an exclusive license. (Def. Mem. of Law 9–11.) Mercer cites limitations to MFS's ability to bring patent suits, limitations to MFS's ability to sublicense and/or transfer rights to the Patents, and limitations on MFS's right to file for additional rights under the Patents.[10] (*Id.*)

Several of the Federal Circuit's earlier decisions indicate that if the patent owner could give licenses to others or encumber a licensee's ability to transfer patent rights, then the license was not an exclusive license, which would support Mercer's argument that MFS does not have standing. *See, e.g.*, *Morrow*, 499 F.3d at 1342 ("[T]he transfer of the right to sue . . . [does] not provide standing to even participate in the suit because the *agreement* did not clearly manifest that the owner would refrain from granting a license to anyone else in the particular area of exclusivity. . . . [T]he right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would

---

[10] Mercer relies on several cases that are not helpful to the Court, since they address the issue of whether a licensee has an exclusive license with all substantial rights, and thus can sue in its own name, or an exclusive license without all substantial right, thus needs to join the patent owner; it has already been resolved that MFS does not have all substantial rights to the Patents. *See, e.g.*, *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005) (the licensee had "fewer than all substantial patent rights . . . . [t]hus, [the licensee] d[id] not have standing to sue alone without joinder of [the licensor]"); *Speedplay, Inc. v. Bebop, Inc*., 211 F.3d 1245, 1252 (Fed. Cir. 2000) (finding that licensee was given all substantial rights to the patent and could sue it its own name); *Gaia Techs., Inc. v. Reconversion Tech., Inc*., 93 F.3d 774, 779–80 (Fed. Cir. 1996) (holding that the plaintiff did not have standing to sue on its own because plaintiff had not provided written proof that it was an assignee (which is a party who has been granted all substantial rights in a patent)); *Abbott Labs. v. Diamedix Corp*., 47 F.3d 1128, 1133 (Fed. Cir. 1995) (holding that licensee had an exclusive license without all substantial rights and thus the patent owner had to be joined). The issue before the Court is whether MFS has an exclusive license with less than all substantial rights or simply a bare license.

otherwise be excluded." (emphasis in orginal)); *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187,

1194 (Fed. Cir. 2007) (holding that licensee was not given an exclusive license when it was "not

allowed to assign its interests under the agreement without [licensor's] consent, which can be

withheld on any ground . . . [and] [licensee] must provide [licensor] with notice and obtain

[licensor's] consent to its selection of targets for licensing and suit."); *Textile Prods., Inc. v.*

*Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1998) (restrictions on the licensees right to sell,

assign, and sublease the patent rendered the license a bare license).

      However, recent Federal Circuit decisions have moved away from a focus on the

restrictions placed on a licensee in determining whether or not a licensee has an exclusive license

and have held that restrictions on the licensee alone are not dispositive.  *See, e.g*, *Delano Farms*

*Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1342–43 (Fed. Cir. 2011), *cert. denied*, No.

11-CV-1371, 2012 WL 1684644 (Nov. 26, 2012) (holding that licensee could sue even when

licensor restrained the licensee's right to sue and maintained control over the right to sublicense);

*WiAV Solutions*, 631 F.3d at 1266 (finding the licensee had standing to sue when others held a

license and the licensor theoretically still retained the right to sublicense); *Alfred E. Mann*

*Found.*, 604 F.3d at 1359 (holding that despite restrictions on licensees right to sue and licensors

retention of the power to sublicense to others, licensee had an exclusive license and could have

standing if it was joined by the owner).

      In *Alfred E. Mann Foundation for Scientific Research*, a 2010 decision, the Federal

Circuit found that despite restrictions on the licensee's right to sue[11] and the licensors retention

of the power to sublicense to others, the licensee had an exclusive license and could have

standing.  604 F.3d at 1359.  Even though the licensee had restrictions, there were also

---

[11] The license agreement required licensor's prior approval for litigations, which it could
deny.  *Alfred E. Mann Found.*, 609 F.3d at 1359–61.

restrictions on the licensor that prevented the licensor from giving others a license to the exclusive area covered by the license.  *Id.* at 1362.

Similarly, in *WiAV Solutions LLC v. Motorola, Inc*., also in 2010, the Federal Circuit held that the licensee need not "be the *only* party with the ability to license the patent."  631 F.3d at 1266 (emphasis in original).  "[A] licensee is an exclusive licensee of a patent if it holds any of the exclusionary rights that accompany a patent."  *Id.* at 1266.  The question for courts is not "whether [the licensee] ha[d] established that it ha[d] the right to exclude *all* others from practicing the patent.  The question [wa]s whether [the licensee] has shown that it has the right under the patents to exclude *the [d]efendants* from engaging in the alleged infringing activity and therefore is injured by the [d]efendants' conduct."  *Id.* at 1267 (emphasis in original).  Even if the licensor could theoretically give licenses to others, a licensee would have standing as long as the licensee exercised an exclusive license to a patent not held by the infringer.  *Id.* at 1267.

More recently in December 2011, in *Delano Farms Co. v. California Table Grape Commission*, the Federal Court noted that the license agreement did not give "*any right* to enforce the patent against suspected infringers" to the licensee.  655 F.3d at 1342 (emphasis added).  The licensor had also retained control over sublicenses:  Sublicense agreements were "subject to prior submission to and approval" by the licensor; and the licensor retained the right to dictate that the licensee must issue a sublicense.  *Id.* at 1343.  Nevertheless, the licensee could still be a party to the litigation, as long as it joined the licensor, because the agreement granted the licensee "exclusive right to, among other things, use, propagate, and sell the patented varieties as well as to grant sublicenses[.]"  *Id.* at 1342–43.

Even in an older case from 2001, the Federal Circuit found that the requirement that the licensor "consent to certain actions and be consulted in others, and the limits on [the licensee's]

14

right to assign its interests in the . . . patent" meant that licensee had been given "fewer than all substantial rights in the . . . patent[.]" *Intellectual Prop.* 248 F.3d at 1345. The licensee nevertheless had an exclusive license and could sue if the patent owner were joined. *Id.* at 1349.

Mercer relies on *Rite-Hite Corp. v. Kelley Co., Inc.*, a 1995 case, where the Federal Circuit found that the contract at issue did not confer an exclusive license but was a contract to "solicit and make sales of products made by Rite–Hite in a particular 'exclusive' sales territory." 56 F.3d at 1552–53. Most importantly for the Federal Circuit, the plaintiffs in *Rite-Hite Corp.* had "no right under the agreements to exclude anyone from making, using, or selling the claimed invention." *Id.* at 1553. "Any remedy [the plaintiffs] might have had for violation of its rights would lie in a breach of contract action against [the owner of the patent], if the agreement was breached, not in a patent infringement action against infringers." *Id.* at 1553. "These agreements were simply sales contracts between [the patent owner] and its independent distributors. They did not transfer any proprietary interest in the . . . patent and they did not give the [plaintiffs] the right to sue [for patent infringement]." *Id.* at 1553. Thus, the Federal Circuit found that the plaintiffs "were not licensees under the patent, except perhaps as non-exclusive licensees by implication" and they therefore did not have standing, even with the cooperation of the patent owner. *Id.* at 1553–54.

*Rite Hite* is distinguishable from the case before the Court because not only were there no explicit rights to the patent in the contract, but also there were no "obligations and rights . . . to be implied . . . [n]or [had plaintiffs] even argue[d] that the[y] had the right under their contracts to bring suit for infringement against another" user of the patented product. *Id.* at 1553. Here, the Agreement does not say that MFS does not have the right to sue for patent infringement, it simply requires MFS to first seek written permission to do so. (*See* Furth Decl. Ex. E.)

Moreover, the March 3, 2008 letter from Stuart Perry specifies that MFS could sue for infringement if it hired Weiss and paid all the litigation cost and expenses (Furth Decl. Ex. F); as Tilton testified, the former holders of the exclusive license simply wanted to be notified if there was a suit.  (Tilton Test. 42:7–43:6.)

Although Mercer would like the Court to focus only on the Agreement, the law clearly allows the Court to look at the parties' intentions to determine whether an exclusive license with substantial rights was granted to MFS.  *Telebrands Corp.*, 719 F. Supp. 2d at 289–90 ("[C]ourts look to the intention of the parties and examine the substance of what was granted to the licensee in order to determine whether the licensee has obtained all substantial rights.").  While assignments must be in writing, licenses may be implied.  *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1344 (Fed. Cir. 2006) ("[A]n assignment must be in writing, while a license can be implied.").  This rule includes exclusive license; therefore, MFS could have an implied exclusive license.  *See, e.g*, *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 705 (Fed. Cir. 2008) ("This court has also concluded that an exclusive license need not be in writing for the exclusive licensee to have standing to sue with the patentee as a co-plaintiff."); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1025 (Fed. Cir. 2006) ("[A] licensee is an exclusive licensee only if the patentee has promised, expressly or *impliedly*." (emphasis added)); *Miracle Optics, Inc*., 434 F.3d at 1344 (opining that there could be "an exclusive licensee with the right to sue[,]" which was "an implied license").  Thus, "an exclusive license need not be in writing for the licensee to have standing if the patentee or assignee is also joined."  *Altair Eyewear*, 288 F. App'x at 706.  "Determining whether there was an implied license between [parties] prior to the filing of the complaint may involve a factual determination."  *Miracle Optics*, 434 F.3d at 1344.  "[F]or the party to establish that it was an

16

implied exclusive licensee of the patents it 'must have received the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.'" *WiAV Solutions*, 631 F.3d at 1266 (alteration and citations omitted).

Here, the language of the Agreement that Mercer argues restricts MFS from transferring, selling, sublicensing and encumbering the Patents "[u]ntil the Note is fully paid and/or satisfied" and from litigating the validity of the Patents or license "without the written approval" of the sellers "prior to paying off the Note *and obtaining full ownership of the intellectual property*[,]"and therefore gives MFS nothing more than a bare license actually suggests that it does the opposite.  (*See* Def. Mem. of Law 7–14; Furth Decl. Ex. E) (emphasis added).  This language suggests that far from conveying to MFS a bare license, where MFS would have no right to exclude others, what was sold to MFS was an exclusive license along with future full *ownership* of the Patents upon full payment of the Note.[12]  However, because payment for the Patents was to be made by MFS in monthly installments pursuant to the Note, the sellers restricted MFS's rights to the Patents, requiring MFS to seek permission before litigating a patent infringement suit or encumbering or transferring the Patents in anyway.  Such restrictions alone do not negate MFS's standing.  *Delano Farms*, 655 F.3d at 1342–43 (licensee held exclusive license, even though licensor restrained the licensee's right to sue and maintained control over the right to sublicense); *WiAV Solutions*, 631 F.3d at 1266 (licensee had an exclusive license even when others held a license and the licensor theoretically still retained the right to sublicense); *Alfred E. Mann Found.*, 604 F.3d at 1359–61 (licensees held exclusive

---

[12] The plain language of the Agreement suggests that upon payment of the Note, MFS would *own* the Patents, not just have an exclusive license with *all* substantial interests.  Indeed, since the commencement of the litigation, this is in fact what has happened.  MFS paid the Note in full, and ownership of the Patents has been transferred to MFS.  (Scheinberg Decl. ¶¶ 2–3.)

17

license despite licensors retention of the power to sublicense to others and requirement that licensees alert licensor of any intent to litigate the patent with licensor's final approval required for any litigation).

Construing the evidence in the light most favorable to Plaintiffs, the non-moving party, as the Court is required to do, and drawing all inferences in favor of Plaintiffs, there is ample evidence in the record from which a reasonable jury could find that SLP had an exclusive license to the Patents, which was transferred to MFS, and, therefore, MFS has standing under the exclusive license to sue Defendant for its alleged infringement of the Patents.  On March 1, 2007, SLP sold its implied exclusive license to the Patents along with SLP's other assets to MFS.[13]  (Tilton Test. 29:1–34:8; 47:25–49:1; *see also* Furth Decl. Exs. E, G.)  Under this license, MFS was the only entity that would have exclusive ability to make, use, or sell the Patents. (Tilton Test. 29:1–34:8; 47:25–49:1; *see also* Furth Decl. Exs. E, G.)  According to Tilton's testimony he did not believe that Venetian could even "legally" sublicense to another party. (Tilton Test. 48:25–49:1.)  It was certainly not the parties' intention to leave the right to sublicense with Venetian, which "was not a distributor, was not in the business of eyewear . . . [and] was purely a holding mechanism for the patents with no intent whatsoever to operate as a business in that industry.  (*Id.* at 32:11–14.)  Tilton, as a named party to the Agreement, further testified that it was the intent of the sellers, pursuant to the Board Resolution and the Agreement, to transfer the entire exclusive license and all interest in SLP to MFS, and to simply keep title to the Patents as collateral until the Note was paid in full.[14]  (*Id.* at 29:1–34:8.)  A reasonable jury

---

[13] As discussed above, an exclusive license may be implied.  *Altair Eyewear*, 288 F. App'x at 705; *DePuy Spine*, 469 F.3d at 1025; *Miracle Optics*, 434 F.3d at 1344.

[14] The case before the Court is distinguishable from *Abraxis Bioscience, Inc. v. Navinta LLC*, on which Mercer relies.  625 F.3d 1359, 1367 (Fed. Cir. 2010), *cert. denied*, 132 S. Ct. 115

could find that the parties intended to confer an exclusive license; thus, at a minimum, MFS had

an *implied* exclusive license.  *See, e.g.*, *Altair Eyewear*, 288 F. App'x at 706.[15]

In view of the record, and based on the more recent cases from the Federal Circuit, this

court finds that there is sufficient evidence in the record from which a jury could reasonably find

that MFS had an exclusive license with substantial rights and therefore has standing to pursue its

alleged patent infringement claim against Mercer.  Defendant's motion for summary judgment as

to the patent infringement claim is denied.

### c.  Fraud Claim

Plaintiffs allege that Mercer intentionally placed a false patent number on the sunglasses

it sold, as well as on its marketing materials, brochures, sales literature and the Internet, to

confuse consumers.  (Compl. ¶¶ 22–34.)  Because MFS and Mercer are direct competitors,

Plaintiffs argue they were harmed by the customers' reliance on Mercer's misstatements.  (*Id.*)

The elements of fraud in New York are "(i) a material misrepresentation of a presently

existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by

---

(2011).  In *Abraxis* there was only a promise for future assignment, which was not completed
until after the litigation had begun.  *Id.*  Here, there is evidence on the record that MFS was
transferred an exclusive license, without all substantial rights, in March 2007 and all substantial
rights after the commencement of the litigation.  Therefore, MFS had constitutional standing to
bring the lawsuit on its own at the start of the litigation and gained prudential standing to bring
the lawsuit when Venetian was added as a plaintiff.  (*See supra* Part III(b)(i).)

[15] In *Aspex Eyewear, Inc. v. Altair Eyewear, Inc*, the Federal Circuit upheld the district
court's determination that there was enough evidence in the record to create disputed facts
concerning whether or not the licensee was granted an exclusive license or a bare license.
Evidence supporting a possible finding of an exclusive license included:  the fact that the
licensor and licensee were "both owned by members of the same family and have a close
business relationship[;]" the licensee had "operated as an exclusive licensee, distributing
products made pursuant to the patents-in-suit and seeking to enforce its rights under the
patents[;]" and *"a member of the family* that own[ed] both [licensor and licensee] *testified that
oral and implied agreements exist that grant[ed] [licensee] an exclusive license to the patents-
in-suit*."  *Altair Eyewear*, 288 F. App'x at 706 (emphasis added).

[plaintiff]s; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 488 (2007)).  In addition, to meet the requirement of Rule 9(b) of the Federal Rules of Civil Procedure, "the plaintiff must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Johnson*, 660 F.3d at 143 (2d Cir. 2011) (citing Fed. R. Civ. P. 9(b)).  "[W]hile the 'actual  fraud alleged must be stated with particularity the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity.'" *Wight v. BankAmerica Corp*., 219 F.3d 79, 91 (2d Cir. 2000) (citations and alterations omitted). "[I]t is 'sufficient under Rule 9(b) if plaintiffs provide an adequate basis for their allegations and give defendants enough information to put them on notice of the nature of the claim.  Rule 9(b)'s requirements may be relaxed as to matters particularly within the opposing party's knowledge." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 561 (E.D.N.Y. 2010).

Mercer argues that Plaintiffs have not sufficiently pled the elements of fraud.  In their reply, Mercer argues that Plaintiffs specifically failed to plead their reliance on any alleged misrepresentations.  (Def. Reply 9–11.)  Plaintiffs' allegations of fraud include the following: (1) Defendants[16] "fraudulently placed a false patent number on the Sun Protector sunglasses sold by them[;]" (2) "Defendants have stated on their packaging and literature that the sunglasses are patented and that the sunglasses are protected by an Australian [p]atent and provided information with regard to this patent number[;]" (3) "[t]he patent number provided by Defendants relates to

---

[16] While Mercer asserts that Baby Blanket Suncare was improperly made a defendant in the case and that Mercer is the correct entity (Def. 56.1 ¶ 3.), neither Mercer nor Baby Blanket Suncare has moved to have Baby Blanket Suncare dismissed as a defendant.  Because the fraud claim is pled against both Mercer and Baby Blanket Suncare, this section uses "Defendants" to refer to both entities.

a different product which is not the design currently sold by the Defendants[;]" (4) "customers [were] misled as to the ownership of the sunglasses[;]" (5) because customers were confused about ownership, Plaintiffs were harmed by customers mistakenly buying the Defendants' sunglasses.  (Compl. ¶¶ 22–34.)

      While Mercer is correct that Plaintiffs never pled their own reliance on misrepresentations, New York allows plaintiffs to bring claims based on a theory of third party reliance.  "[T]he doctrine of third-party reliance permits the plaintiff to show that a third-party relied upon a misrepresentation by the defendant, which resulted in injury to the plaintiff." *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, No. 12-CV-1947, 2012 WL 4801769, at *3 (E.D.N.Y. Oct. 10, 2012); *see also Chevron Corp. v. Donziger,* No. 11-CV-0691, 2012 WL 1711521, at *17 (S.D.N.Y. May 14, 2012) ("[T]he New York Court of Appeals' previous decisions allowing recovery for common law fraud based on third party reliance remain authoritative . . . . [a]ccordingly, [plaintiff's] fraud claim cannot properly be entirely dismissed on the present motion for want of sufficient allegations of first-party reliance."); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010) (third-party reliance may establish fraud in the RICO context).  The Complaint never uses the word "reliance;" however, it is clear that the Plaintiffs are claiming that customers relied on the representations, i.e. the false patent number, when buying Defendants' product.  Furthermore, Plaintiffs allege that since Defendants and Plaintiffs were direct competitors, Plaintiffs were harmed by customers' reliance on Defendants' misstatements.[17]  They also allege that Defendants said the misstatements with

---

[17] The case before the Court is distinguishable from the *E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co.*, which Mercer relies.  No. 00-CV-8670, 2003 WL 22068573, at *33 (S.D.N.Y. Sept. 5, 2003), *report and recommendation adopted*, 2005 WL 535065 (S.D.N.Y. Mar. 8, 2005).  In *E-Z Bowz*, the court found that general statements about the validity of the patent made to "the general public or the courts involved in this lawsuit" could not be the basis for a fraud claim

the intent to mislead.  Plaintiffs have sufficiently pled a fraud claim against Defendants;

therefore, Mercer's motion to dismiss the fraud claim is denied.

## IV.     Conclusion

For the foregoing reasons Mercer's motion for summary judgment and its motion to

dismiss are denied.


SO ORDERED:


___/s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: December 21, 2012
          Brooklyn, New York

---

because the cross movant could not demonstrate that he suffered any harm.  (*Id.*)  Here, the
statements were made not to the general public but to Plaintiffs' customers and Plaintiffs were
directly harmed by the loss of business.